USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 94-1224 LUCAS P. BAEZ, Petitioner, v. IMMIGRATION AND NATURALIZATION SERVICE, Respondent. _________________________ ON PETITION FOR REVIEW OF AN ORDER OF THE BOARD OF IMMIGRATION APPEALS _________________________ Before Selya, Cyr and Stahl, Circuit Judges. ______________ _________________________ Paul F. Murphy, with whom MacDonald, Murphy & May was on ______________ ________________________ brief, for petitioner. Joan E. Smiley, Attorney, Office of Immigration Litigation, ______________ Civil Division, Department of Justice, with whom Frank W. Hunger, _______________ Assistant Attorney General, Civil Division, and Lauri Steven _____________ Filppu, Attorney, Office of Immigration Litigation, were on ______ brief, for respondent. _________________________ December 6, 1994 _________________________ SELYA, Circuit Judge. Petitioner Lucas P. Baez, also SELYA, Circuit Judge. ______________ known as Lucas Porfirio Baez-Soto, also known as Domingo Guzman, an alien who was deported following a state narcotics conviction, attempts to challenge the refusal of the Board of Immigration Appeals (BIA or Board) to reopen its decision to deny him a waiver of deportability. Petitioner's case requires this court to make its initial interpretation of the jurisdictional bar contained in the departure clause of section 106(c) of the Immigration and Nationality Act (the Act), 8 U.S.C. 1105a(c) (1988).1 The courts of appeals have divided on whether this statute signifies what it appears to say. We conclude that the statute's plain meaning must prevail, and, therefore, an alien's departure from the United States, whether voluntary or involuntary, deprives the federal courts of jurisdiction to entertain challenges to an antecedent order of deportation. Because the instant petition solicits judicial inquiry into the correctness of the deportation order that brought about petitioner's departure, we dismiss it for want of appellate jurisdiction. I. BACKGROUND I. BACKGROUND Petitioner is a native and citizen of the Dominican Republic. He lawfully entered the United States as a child in 1972. In 1986, he was convicted in a Massachusetts state court  ____________________ 1The statute provides in material part that "[a]n order of deportation . . . shall not be reviewed by any court if the alien . . . has departed from the United States after the issuance of the order." 8 U.S.C. 1105a(c) (1988). 2 of distributing cocaine, and received a five-to-ten-year incarcerative sentence. An alien's commission of a serious drug offense invites deportation. See 8 U.S.C. 1251(a)(11) (1988); ___ see also 8 U.S.C.A. 1251(a)(2)(B)(i) (West Supp. 1994) (current ___ ____ version). Adhering to the statutory scheme, the Immigration and Naturalization Service (INS) issued an order asking petitioner to show cause why he should not be deported. Following petitioner's release from prison in 1988, an immigration judge (IJ) held a hearing on the show-cause order. Under section 212(c) of the Act, 8 U.S.C. 1182(c), a lawfully admitted resident alien domiciled in this country for no fewer than seven years who has been convicted of a drug offense may secure relief from deportation on the basis of that conviction if the Attorney General determines that a waiver appears to be in the national interest because social and humane considerations outweigh the adverse factors evidencing the alien's undesirability.2 See Gouveia v. INS, 980 F.2d 814, 816-19 (1st ___ _______ ___ Cir. 1992) (elucidating balancing test); Matter of Marin, 16 I. & _______________ N. Dec. 581 (BIA 1978) (similar). During the hearing, petitioner conceded deportability, invoked section 212(c), and requested a discretionary waiver. On June 16, 1989, the IJ issued a decision favorable to petitioner. The judge noted adverse factors,  ____________________ 2The Attorney General has duly delegated this power to her subordinates within the INS apparatus, with the proviso that applications "for the exercise of discretion under section 212(c) of the Act shall be submitted . . . to: (1) the [appropriate regional] director . . .; or (2) the Office of the Immigration Judge . . . ." 8 C.F.R. 212.3(a) (1994). 3 including petitioner's cocaine conviction and neglect of his children, but found those factors overbalanced by petitioner's extended residence, family ties, and the like. The INS appealed the IJ's decision to the BIA. Under the briefing order applicable to its appeal, the INS had until August 23, 1990, to file its brief, but the matter apparently fell between the cracks. On August 28, petitioner filed a motion to dismiss the appeal with the IJ. The INS responded by serving the wayward brief the next day and, shortly thereafter, submitting its formal opposition to the dismissal motion. In early September, petitioner, apparently realizing belatedly that his motion should have been filed with the BIA rather than the IJ, refiled it with the BIA. After an unexplained three-year lull, the BIA issued an order on September 30, 1993, in which it reversed the IJ's decision, denied petitioner's request for a waiver, and ordered him deported. On November 22, 1993, at 11:15 p.m., Paul F. Murphy, counsel of record for the petitioner, received a telephone call from petitioner's sister informing him that the INS had taken petitioner into custody that day and intended to deport him posthaste. Attorney Murphy claims that, as of that moment, he did not know of the Board's September 30 decision. The next day, the lawyer moved to stay deportation and reopen the proceedings. He filed these motions at the IJ's chambers in Boston. Early that afternoon, the motions were forwarded to the BIA's office in Falls Church, Virginia. At 2:00 p.m., Attorney Murphy telephoned 4 the BIA and supplied an oral statement in order to facilitate immediate review of the motion to stay deportation. At 4:30 p.m., the BIA notified Attorney Murphy that it had denied the stay because the single member who considered the matter found that the motion to reopen had little likelihood of success.3 The INS deported petitioner on November 24, 1993. On December 13, in pursuance of the applicable regulation, 8 C.F.R. 3.2 (1994), the BIA effectively denied petitioner's motion to reopen, deeming it to be withdrawn by virtue of his deportation. On March 10, 1994, petitioner sought judicial review of the "denial" of his motion to reopen. See 8 U.S.C.A. 1105a (West ___ 1970 & Supp. 1994) (prescribing the procedure for review of final deportation orders in the courts of appeals); see also Giova v. ___ ____ _____ Rosenberg, 379 U.S. 18, 18 (1964) (per curiam) (holding that the _________ BIA's denial of a motion to reopen a deportation proceeding is a judicially reviewable final order). The petition appears to have been filed within the time span fixed by statute.4  ____________________ 3Petitioner did not seek judicial review of the BIA's order within the time then allotted by statute, see 8 U.S.C.A.  ___ 1105a(a)(1) (West Supp. 1994) (providing that petitions for judicial review of such orders must be filed within 90 days); see ___ also infra note 4, despite the fact that the time for doing so ____ _____ had not yet expired. By the same token, petitioner did not seek a stay from this court. 4In 1990, Congress amended 8 U.S.C. 1105a(a)(1) to reduce to 30 days the period within which an alien convicted of certain aggravated felonies on or after November 18, 1988 might petition for judicial review. See Immigration Act of 1990, Pub. L. No. ___ 101-649 502(a), 104 Stat. 4978 (1990). Because petitioner's conviction occurred in 1986, he had 90 days, rather than 30, within which to file his petition in this court, see id. at  ___ ___ 545(b)(1). INS nevertheless argues that, because the petition to 5 II. THE PROFFERS ON APPEAL II. THE PROFFERS ON APPEAL An INS regulation provides in pertinent part that "[t]he decision of the [BIA] shall be in writing . . . and a copy shall be served upon the alien or party affected as provided in part 292 of this chapter." 8 C.F.R. 3.1(f) (1994). The cross- referenced regulation stipulates that service may be effected by mail upon "the attorney or representative of record, or the person himself if unrepresented." 8 C.F.R. 292.5(a) (1994). At all times material hereto, Murphy was petitioner's attorney of record. He claims not to have received timeous notice of the BIA's September 30 decision. Desiring to shed light on this factual issue, we authorized the parties to submit fact-specific proffers anent the notification issue. See Bemis v. United ___ _____ ______ States, 30 F.3d 220, 222 & n.2 (1st Cir. 1994) (authorizing ______ factual proffers on appeal). Petitioner submitted an affidavit signed by Attorney Murphy's secretary, Montsie Moreno, stating that she sorted the lawyer's mail during October of 1993, but did not receive a copy  ____________________ review was not filed within 90 days of the date of the deportation order (September 30, 1993), this court lacks jurisdiction to review that decision. INS's view is problematic. Compare Fleary v. INS, 950 F.2d 711, 713 (11th Cir. 1992) _______ ______ ___ (reaching opposite conclusion after considering 1990 amendments to the Act) and Fuentes v. INS, 746 F.2d 94, 97 (1st Cir. 1984) ___ _______ ___ (similar; considering earlier version of the Act) with Stone v. ____ _____ INS, 13 F.3d 934, 936-39 (6th Cir. 1994) (contra; considering ___ 1990 amendments) and Nocon v. INS, 789 F.2d 1028, 1032-33 (3d ___ _____ ___ Cir. 1986) (same; considering earlier version of the Act). We need not probe this point, for even if INS is correct in its view a matter on which we do not pass it has not argued that the petition for review is untimely as to the Board's jettisoning of the motion to reopen. 6 of the BIA's decision in that time frame. For its part, the INS submitted two sworn declarations. The declaration of April M. Verner, supervisory case management analyst of the BIA's Docket Unit, certified, based on her knowledge of BIA procedure and the record of the case, that a copy of the BIA's September 30, 1993 decision had been mailed contemporaneously to Attorney Murphy at 6 Faneuil Hall Marketplace, Boston, MA 02109 (which was counsel's address of record as indicated on BIA Form EOIR-27, dated September 7, 1990). The second declaration dovetails with Verner's statement but goes on to strike a somewhat different chord. In it, Judith E. Arnott, the Boston-based INS officer who made the arrangements for petitioner's deportation, observed that a copy of Form I-294 (the official notice of the country to which a particular individual's deportation is directed) had been mailed to Attorney Murphy at his address of record shortly after petitioner's deportation, and that the mailing was returned to the INS on December 7, 1993, marked "forwarding time expired." Ms. Arnott added that neither petitioner nor his representative, Attorney Murphy, ever requested the district director to stay petitioner's deportation. The parties filed no further proffers. At oral argument, however, Attorney Murphy advised that he continued to maintain an office at 6 Faneuil Hall Marketplace and implied that he had never arranged to have mail forwarded from that address. Nevertheless, he conceded that, in the fall of 1993, his 7 principal offices were located elsewhere, and the Faneuil Hall office was checked for mail at infrequent intervals (perhaps twice a week). III. ISSUES PRESENTED III. ISSUES PRESENTED Petitioner contends that several errors infected the process leading to his deportation. First, he asseverates that the INS's failure punctually to file its brief deprived the BIA of jurisdiction to hear the initial appeal, and, consequently, that the IJ's decision upholding petitioner's entitlement to a section 212(c) waiver became final agency action (or, put another way, that the BIA's reversal of the IJ's ruling had no force or effect because the BIA's jurisdiction had been pretermitted). Second, petitioner asseverates that, in violation of applicable statutory and administrative rules, the BIA did not properly notify his counsel of its September 30 decision and, therefore, deported petitioner without requisite notice. See, e.g., 8 ___ ____ C.F.R. 243.3(b) (1994) (providing that a deportation order "shall be executed no sooner than 72 hours after service of the decision"). We are powerless to reach the merits of these asseverations, however, for petitioner's deportation deprives this court of subject matter jurisdiction over the request for judicial review. IV. ANALYSIS IV. ANALYSIS Section 106(c) of the Act, 8 U.S.C. 1105a(c), quoted supra note 1, is absolute on its face. It stipulates that a _____ 8 deportation order "shall not be reviewed by any court" once the alien has departed. This flat rule is couched in obligatory terms that reflect Congress's determination to eliminate repetitive and unjustified appeals. See H.R. Rep. No. 1086, 87th ___ Cong., 1st Sess. (1961), reprinted in 1961 U.S.C.C.A.N. 2950, _________ __ 2971-72. Despite the unambiguous language of the statute, some courts, presumably troubled by its rigidity, have read exceptions into it, thereby softening its impact and authorizing post- deportation judicial review under certain circumstances. The Ninth Circuit pioneered this view in Mendez v. INS, 563 F.2d 956 ______ ___ (9th Cir. 1977). There, an alien who had been deported without notice to his counsel, on the basis of a sentence that had been vacated prior to deportation, pressed forward with a petition for judicial review of the deportation order. The court entertained the petition and ordered the alien readmitted to the United States. See id. at 959. In reaching this result, the court read ___ ___ section 1105a(c) as a conditional, rather than an absolute, bar, opining that "`departure' in the context of 8 U.S.C. 1105a cannot mean `departure in contravention of procedural due process.'" Id. at 958. On this basis, the court held that ___ "`departure' means `legally executed' departure when effected by the government." Id. ___ Since the first seed was sown, the Mendez exception has ______ mushroomed in the Ninth Circuit. Today, that court allows judicial review of deported aliens' claims in an array of 9 situations. See, e.g., Zepeda-Melendez v. INS, 741 F.2d 285, ___ ____ _______________ ___ 287-88 (9th Cir. 1984) (entertaining petition on claim that deportation occurred without notice to counsel); Thorsteinsson v. _____________ INS, 724 F.2d 1365, 1367-68 (9th Cir.) (indicating that court ___ would entertain petition on claim that deportation occurred through ineffective assistance of counsel), cert. denied, 467 _____ ______ U.S. 1205 (1984); Estrada-Rosales v. INS, 645 F.2d 819, 820-21 _______________ ___ (9th Cir. 1981) (entertaining petition on claim that deportation was based on invalid conviction). Mendez has not fared as well outside its birthplace. ______ To the limited extent that the decision has evoked admiration, its admirers have doused it with faint praise. A decade ago, the Sixth Circuit referred to the Mendez exception in approbatory ______ terms, but did not squarely adopt it, see Juarez v. INS, 732 F.2d ___ ______ ___ 58, 59-60 (6th Cir. 1984) (citing Mendez in connection with a ______ discussion of an alien's administrative remedies), and to our knowledge has not revisited the question. More recently, a diluted version of the Mendez exception has been afforded safe ______ passage in two other courts of appeals. See Camacho-Bordes v. ___ ______________ INS, 33 F.3d 26, 27-28 (8th Cir. 1994) (hypothesizing that ___ judicial review should be permitted, notwithstanding execution of a deportation order, if a "colorable" claim of a due process violation emerges); Marrero v. INS, 990 F.2d 772, 777 (3d Cir. _______ ___ 1993) (same). At least three other circuits have given Mendez a ______ distinctly unfavorable reception. In Umanzor v. Lambert, 782 _______ _______ 10 F.2d 1299 (5th Cir. 1986), the Fifth Circuit professed "serious reservations" about the Mendez court's holding, and noted that it ______ had become a "sinkhole that has swallowed the rule of 1105a(c)." Id. at 1303 & n.5. The Fifth Circuit expressly ___ rejected Mendez in a subsequent case, explaining that section ______ 1105a(c) was written in plain language that brooked no exceptions to the jurisdictional bar. See Quezada v. INS, 898 F.2d 474, ___ _______ ___ 476-77 (5th Cir. 1990). The Tenth Circuit also adopted a strict interpretation of section 1105a(c), ruling that the statute's "unequivocal" language does not permit a Mendez-type exception to ______ flourish. Saadi v. INS, 912 F.2d 428, 428 (10th Cir. 1990) (per _____ ___ curiam). The Second Circuit recently joined the lengthening anti-Mendez parade. See Roldan v. Racette, 984 F.2d 85, 90 (2d ______ ___ ______ _______ Cir. 1993) (observing that "[t]he pertinent language of 1105a(c) constitutes a clear jurisdictional bar, and admits of no exceptions"). Still another court of appeals has signalled that it is skeptical of Mendez. See Joehar v. INS, 957 F.2d 887, 890 ______ ___ ______ ___ (D.C. Cir. 1992) (declining to consider the Mendez exception in ______ respect to an alien who had departed voluntarily).5  ____________________ 5In United States v. Mendoza-Lopez, 481 U.S. 828 (1987), the _____________ _____________ Supreme Court held that due process requires that collateral review of a deportation order be available in a subsequent criminal prosecution for unlawful reentry when substantial defects in the underlying administrative proceedings foreclosed direct judicial review. Id. at 838. In dissent, Justice Scalia ___ suggested that the majority's opinion necessarily betokened a rejection of the Mendez holding. See id. at 849 (Scalia, J., ______ ___ ___ dissenting). But Justice Marshall, writing for the majority, took pains to "express no view" on Mendez. Id. at 837 n.13. ______ ___ Thus, we take the majority's disclaimer at face value and treat the question as an open one. 11 We reject the Mendez exception. Although Mendez itself ______ ______ presented a compelling case on its peculiar facts and the desire to afford relief is understandable on that plane, we believe the court's willingness to take liberties with the language of section 1105a(c) is mischievous and has produced bad law.6 This straining, dubious at the time, has been rendered all the more suspect by recent Supreme Court opinions emphasizing the importance of a statute's text and plain meaning. See, e.g., ___ ____ Estate of Cowart v. Nicklos Drilling Co., 112 S. Ct. 2589, 2594- ________________ ____________________ 95 (1992); West Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98- ___________________________ _____ 99 (1991); United States v. Ron Pair Enters., Inc., 489 U.S. 235, _____________ ______________________ 241 (1989); see generally David L. Shapiro, Continuity and Change ___ _________ _____________________ in Statutory Interpretation, 67 N.Y.U. L. Rev. 921, 921 & n.2 ___________________________ (1992) (noting judicial efforts to narrow interpretation to coincide with the statutory text and citing recent examples). To embellish section 1105a(c) as Mendez suggests is to import ______ ambiguity into words that are as unambiguous as ordinary linguistic usage permits. That approach is unacceptable, for it mutes the clarion call that Congress has sounded, and, in the bargain, muffles the Court's string of recent "plain meaning" cases. We think that the proper approach to construing section 1105a(c) is to begin with the text of the statute and grant its  ____________________ 6One is reminded of Lord Campbell's admonition that "it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law." East India Co. v. Paul, 7 Moo. 85, 111 (P.C. 1849). ______________ ____ 12 words their ordinary meanings. See Ardestani v. INS, 112 S. Ct. ___ _________ ___ 515, 519 (1991); Heno v. FDIC, 20 F.3d 1204, 1207 (1st Cir. ____ ____ 1994); United States v. Charles George Trucking Co., 823 F.2d ______________ _____________________________ 685, 688 (1st Cir. 1987). Beginning in this way brings our inquiry swiftly to a close, for the plain language of the statute prohibits judicial review of a deportation order once the order has been executed. There is certainly no slack in the command that the order "shall not be reviewed by any court." Having set out this command, the statute contains no mention that it is subject to any exceptions. And contrary to the Mendez court's ______ view, 563 F.2d at 958, we do not believe that there is any principled way to interpret the word "departed" as failing to encompass the most relevant type of departures involuntary departures by way of deportation. See Webster's Third New ___ ____________________ International Dictionary 604 (1986) (defining "depart" to include ________________________ "to go forth or away: set forth: LEAVE"). When Congress plainly marks a path, courts are seldom free to leave it and roam at will in the surrounding veldt. Section 1105a(c) falls within this general rule. Having found a clear meaning in the unvarnished language of the statute, we are duty bound to honor that meaning, not to alter it by applying a judicial gloss. Of course, there are exceptions to this rule, such as when statutory language, though unambiguous, leads to results that are absurd or are diametrically opposed to the drafters' discernible intentions. See Griffin v. Oceanic Contractors, ___ _______ _____________________ 13 Inc., 458 U.S. 564, 571, 575 (1982); Rubin v. United States, 449 ____ _____ _____________ U.S. 424, 430 (1981). But the terrain on which this statute rests is inhospitable to the cultivation of such an exception because the statute, read literally, yields a sensible result. On the whole, a literal reading helps promote Congress's intention to eliminate excessive appeals and lend finality to the deportation process. A judge-made exception to section 1105a(c)'s jurisdictional bar, even one limited to "colorable" due process claims whatever that term may eventually come to mean can too easily expand to engulf the general rule prohibiting review, see Umanzor, 782 F.2d at 1303 n.5, and ___ _______ thereby thwart achievement of the congressional goal. We think it is elementary that a construction which emasculates a statute is not eagerly to be embraced.7 Nor can petitioner's professions of good faith make a significant difference. Although there is no evidence that Baez is seeking to abuse the appellate process, his individual circumstances are insufficient to protect him from the plain language of the statute. As we have noted before, "[t]hat the reasons for Congress's decision to adopt a particular rule may not be present in an individual case . . . is no justification  ____________________ 7Moreover, the strict construction that the language of the statute demands passes constitutional muster. Congress has broad discretion to restrict access to the lower federal courts. See ___ Ankenbrandt v. Richards, 112 S. Ct. 2206, 2212 (1992) (listing ___________ ________ cases). Hence, we perceive no constitutional infirmity in the outright denial of appellate review following an alien's deportation. See Roldan, 984 F.2d at 90-91 (upholding ___ ______ constitutionality of 1105a(c) as jurisdictional bar to habeas corpus); Umanzor, 782 F.2d at 1304 (same). _______ 14 for failing to give effect to the rule in that case." In re _____ Plaza de Diego Shopping Ctr., Inc., 911 F.2d 820, 832 n.20 (1st ___________________________________ Cir. 1990). We add an eschatocol of sorts. Even if we were to acknowledge that some extreme situations, such as a knowingly unlawful deportation by the INS for the specific purpose of shortstopping an alien's right to review, might justify an exception to section 1105a(c)'s jurisdictional bar, petitioner's claims are not of this stripe. His case hinges on a pair of grievances. Insofar as it depends on INS's deviation from the briefing schedule, it is baseless; the BIA has wide discretion in administering compliance with briefing orders and determining the consequences of a late submission. See, e.g., Getachew v. INS, ___ ____ ________ ___ 25 F.3d 841, 845 (9th Cir. 1994) (finding no error in BIA's discretionary decision to accept untimely brief from INS); see ___ also 8 C.F.R. 3.1(d)(1) (1994) (providing that "the Board shall ____ exercise such discretion and authority . . . as is appropriate and necessary for the disposition of the case"). Here, INS's six-day delay seems fribbling, and the BIA's decision not to vitiate the appeal on that ground strikes us as both reasonable and lawful. Similarly, petitioner's other grievance does not indicate the need for heroic measures. The likely explanation of Attorney Murphy's failure to receive his copy of the BIA decision does not implicate purposeful scheming by the INS, but suggests the accidental misdelivery of properly addressed mail by the 15 postal service a vagary that plagues us all. And despite the late notification, Attorney Murphy still had time to present a motion for a stay of deportation to a member of the BIA. Once that motion was denied, he had open, but chose not to pursue, several other remedial avenues, including asking the district director or a court for a stay of the deportation order. Under the circumstances, we do not think that petitioner has alleged the type of extreme unfairness that might warrant overriding the plain language of the statute. V. CONCLUSION V. CONCLUSION We need go no further. We join those of our sister circuits that have followed the plain language of section 1105a(c) and found its jurisdictional bar to be absolute. Reading the statute in that manner, the petitioner's involuntary departure from the United States deprives us of jurisdiction to examine the correctness of either the underlying deportation order or the Board's disposition of the motion to reopen. Accordingly, the petition for judicial review is Dismissed. Dismissed. _________ 16