**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VIOLETA CIRCU,

*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,

*Respondent.*

No. 02-73420

Agency No.
A73-415-760

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted En Banc
December 13, 2005—Portland, Oregon

Filed June 9, 2006

Before: Mary M. Schroeder, Chief Judge, Harry Pregerson,
Pamela Ann Rymer, Andrew J. Kleinfeld, Sidney R. Thomas,
Barry G. Silverman, M. Margaret McKeown,
Raymond C. Fisher, Marsha S. Berzon,
Johnnie B. Rawlinson, and Consuelo M. Callahan,
Circuit Judges.

Unanimous Opinion by Judge Callahan

**COUNSEL**

Jagdip Singh Sekhon, San Francisco, California, briefed and argued the cause for the petitioner.

Margaret Perry, Washington, D.C., U.S. Department of Justice, argued the cause for the respondent. With her on the briefs were Peter D. Keisler, Donald E. Keener, Christopher C. Fuller, and Janice K. Redfern.

**OPINION**

CALLAHAN, Circuit Judge:

Based primarily on a fear of future religious persecution in her native country of Romania, the petitioner, Violeta Circu, applied for asylum and other relief here in the United States. The immigration judge ("IJ") held a hearing on the matter, where the U.S. State Department's 1997 Romania Country Report on Human Rights Practices ("1997 Report") and 1997 Profile of Asylum Claims and Country Conditions for Romania were admitted into evidence. Two years after the hearing, however, the IJ, relying on a 1999 Country Report on Human Rights Practices ("1999 Report") published by the State Department nineteen months after the matter was argued and submitted, denied Circu's petition. Circu did not receive notice that the IJ intended to take administrative notice of the 1999 Report and was not afforded an opportunity to respond to its contents before the IJ issued her decision. The Board of Immigration Appeals ("BIA") summarily denied Circu's appeal, in which she requested an opportunity to counter the 1999 Report. She then sought review in this court, citing our

decision in *Getachew v. INS*, which held that due process requires "*both* notice to the applicant that administrative notice will be taken *and* an opportunity to rebut extra-record facts or to show cause why administrative notice should not be taken of those facts." 25 F.3d 841, 846 (9th Cir. 1994) (emphasis in original). We grant the petition for review because the BIA did not correct the IJ's procedural due process violation.

## I.   BACKGROUND

The underlying facts are not disputed. Circu is a native and citizen of Romania, where Romanian Orthodox Christianity is the predominant religion. Circu and her family are Pentecostal Christians. On November 2, 1994, she entered the United States as a nonimmigrant visitor for pleasure and was authorized to remain here until November 1, 1995. On March 27, 1996, the Immigration and Naturalization Service ("INS," now the Department of Homeland Security) charged that Circu was subject to deportation for overstaying her visa under 8 U.S.C. § 1251(a)(1)(B) (currently, 8 U.S.C. § 1227(a)(1)(B)). Conceding deportability, Circu applied for asylum based primarily on religious persecution.

A staggered two-day deportation hearing was held before an IJ in March and July of 1998. Circu testified that the religious persecution of her family dates back to the 1950s, before she was born, when her grandfather was jailed and his house was seized because he was a founder of a Pentecostal religion in Romania. When she was four years old, her father was imprisoned for six months for trying to leave the country, and her family was forced to move to a different town and to live in barracks. Circu's healthy infant brother was taken from her family to a hospital where he later died of meningitis. Circu's mother suffered two miscarriages on account of persecution.[1] Circu was denied admission to Romanian public univer-

---

[1] Incidentally, a different IJ granted Circu's mother asylum in February 1996 based on the severity of the mother's past religious persecution in Romania.

sities on several occasions, despite having stellar test scores. Circu was summoned to the headquarters of the Romanian secret police where she was told that she would gain admission into a public university in exchange for sex. Circu was expelled from a private university after attempting to publish articles detailing atrocities committed by the Romanian government. The IJ found that Circu testified credibly.

In August 2000, more than two years after the conclusion of the hearing, the IJ filed an opinion denying Circu's petition for relief, but permitting her to voluntarily depart the United States. Although the IJ found that Circu "met her burden of proving that she suffered past persecution in her homeland *during the Communist regime*," entitling her to a presumption of a well-founded fear of future persecution, the IJ found that the INS successfully rebutted this presumption with evidence of changed-country conditions. (emphasis in original). With regard to this finding, the IJ stated:

> The January 1997 Profile of Country Conditions issued by the Department of State states that Pentecostals and other unregistered sects had a difficult time in Romania. *See* Exhibit 12. However, the 1999 Report indicates that open worship is now possible and is only marred occasionally by unsanctioned harassment by local officials. *See* Romania Country Report on Human Rights Practices for 1999, dated February 25, 2000.

The 1997 Profile of Country Conditions was part of the administrative record. The 1999 Report, however, was released on February 23, 2000, nineteen months after the conclusion of the hearing, and was not part of the administrative record.

Circu appealed the IJ's decision to the BIA, arguing, *inter alia*, that the IJ erred in relying on documents not in the record to find that country conditions had changed in Roma-

nia. She requested a remand to the IJ for an opportunity to rebut the 1999 Report. The BIA summarily affirmed the IJ's decision without opinion.

Circu then petitioned this court for review. A divided panel of our court denied the petition. *Circu v. Ashcroft*, 389 F.3d 938, 941 (9th Cir. 2004). We granted en banc review. *Circu v. Gonzales*, 427 F.3d 622 (9th Cir. 2005).

## II.  STANDARD OF REVIEW

Where, as here, the BIA affirms the IJ's decision without opinion, we review the IJ's decision as the final agency action. *Kebede v. Ashcroft*, 366 F.3d 808, 809 (9th Cir. 2004) (citing *Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir. 2003)). Although we generally review claims of due process violations in deportation proceedings de novo, *e.g.*, *Barraza Rivera v. INS*, 913 F.2d 1443, 1448 (9th Cir. 1990), "we review the procedures the Board uses to take administrative notice of facts not in the record for abuse of discretion." *Getachew*, 25 F.3d at 845.

## III.  ANALYSIS

The IJ's finding that Circu suffered past persecution entitled Circu to the legal presumption of a well-founded fear of future persecution. *Borja v. INS*, 175 F.3d 732, 737 (9th Cir. 1999) (en banc). The government may rebut this presumption by showing by a preponderance of the evidence that the conditions in Romania "have changed to such an extent that [Circu] no longer has a well-founded fear that she would be persecuted, should she return there." *Id*. at 738. The IJ determined that Circu's presumption of a well-founded fear had been rebutted by the 1999 Report.

**[1]** Over a decade ago, we held that notice of intent to take administrative notice of events occurring after the hearing is all that is required if extra-record facts and questions are

" 'legislative, indisputable, and general.' " *Getachew*, 25 F.3d at 846 (quoting *Castillo-Villagra v. INS*, 972 F.2d 1017, 1029 (9th Cir. 1992)). On the other hand, more "controversial or individualized facts require *both* notice to the [alien] that administrative notice will be taken *and* an opportunity to rebut the extra-record facts or to show cause why administrative notice should not be taken of those facts." *Id.* (emphasis in original); *accord Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (" 'The fundamental requisite of due process of law is the opportunity to be heard' " and "[t]his right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to . . . acquiesce or contest." (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914))). *Getachew* relied on *Castillo-Villagra*, a case which explained that "[i]t is not necessary to warn that administrative notice will be taken of the fact that water runs downhill. Some propositions, however, may require that notice not be taken, or that warning be given, or that rebuttal evidence be allowed. The agency's discretion must be exercised in such a way as to be fair in the circumstances." *Castillo-Villagra,* 972 F.2d at 1028. As we held in *Castillo-Villagra*, an IJ may take administrative notice of a change of government, but where it is plausible that the change does not eliminate the danger to the individual petitioner, the IJ must give the petitioner an opportunity to be heard on the question of the individual impact. *Id.*

**[2]** The 1999 Report contains extra-record facts that are "controversial." *Getachew*, 25 F.3d at 846. Accordingly, Circu was entitled both to notice of the IJ's intent to take administrative notice of the 1999 Report and an opportunity to respond to that report. This point is made clear in *Getachew*. There, the government asked the BIA to take notice of the fact that the Marxist government in the petitioner's native country fell two months after the deportation hearing before the IJ. *Id.* at 843-44. In concluding that the petitioner was entitled to notice of the BIA's intent to take administrative notice of this fact and an opportunity to rebut it, this court dis-

tinguished between "indisputable" facts and "controversial" facts. *Id*. at 846. The sole example given of an "indisputable" fact is a political party's victory in an election. *Id*. An example of a "controversial" fact is "whether the election has vitiated any previously well-founded fear of persecution." *Id.* The 1999 Report plainly falls into the latter category because the IJ's assertion that "open worship is now possible [in Romania] and is only marred occasionally by unsanctioned harassment by local officials" is based on her determination that the 1999 Report vitiates Circu's previously well-founded fear of persecution.

**[3]** Neither of *Getachew*'s requirements for taking administrative notice of disputable facts were met in this case. The government's argument that Circu was afforded notice of the IJ's intent to rely on the 1999 Report ignores the fact that Circu was not given notice prior to the IJ's taking administrative notice of the report. The only notice Circu received that the IJ would consider the 1999 Report was the IJ's opinion. This after-the-fact reference clearly fails to afford Circu warning that the IJ planned on taking administrative notice of the 1999 Report. *See id*. at 846. The 1999 Report did not even exist at the time of Circu's hearing before the IJ, and the IJ explicitly relied on that report, noting the possibility for open worship, which differed from the information provided in the 1997 Report.

**[4]** Furthermore, Circu was never given the opportunity to counter the 1999 Report before the IJ relied on the statements made therein to find that conditions in Romania had changed to allow Circu's return without an objective fear of persecution.**²**

---

**²**In the appendix to this opinion, we provide a table that compares the relevant portions of the two reports, adding emphasis to their differences. The record demonstrates that the IJ saw significant differences between the 1999 Report and the 1997 Report, and based her decision specifically on those differences. Indeed, there are several notable variances between the two reports: the 1999 Report does not specifically mention which

While establishing a due process violation always requires a showing of prejudice,[3] *Ramirez-Alejandre v. Ashcroft*, 320 F.3d 858, 875 (9th Cir. 2003) (en banc), Circu satisfied her burden here by showing that the IJ perceived significant differences between the evidence in the record and the improperly noticed 1999 Report, and that the IJ relied on those differences in rendering a decision.

[5] The BIA compounded the error by failing to remand the matter to the IJ to afford Circu an opportunity to rebut the 1999 Report. The government misses the point by arguing that Circu had an adequate opportunity to respond to the 1999 Report in her appeal to the BIA. As noted, due process requires notice and an opportunity to respond before the IJ renders her decision. The appeal to the BIA did not afford the procedural means by which Circu could submit evidence to refute the points asserted in the 1999 Report. *Id.* at 865-66.

denominations continue to make credible allegations of persecution, whereas the 1997 Report specifically named "Protestant denominations" as making credible allegations of harassment; and the 1999 Report discusses the mechanism whereby religious groups have to register with the Romanian government, whereas the 1997 Report does not address this subject. Given an opportunity to rebut the 1999 Report, Circu may be able to show that her Pentecostal group is one of the denominations that continues to make credible allegations of persecution and is subjected to an oppressive registration process in order to function as a religion in Romania. Of course, providing Circu with an opportunity to rebut the 1999 Report does not necessarily mean that the IJ will reach a different decision on Circu's asylum petition.

[3]This standard is met under circumstances in which an alien's interests are harmed "in such a way as to affect potentially the outcome of the[ ] deportation proceedings." *United States v. Cerda-Pena*, 799 F.2d 1374, 1378 (9th Cir. 1986) (quotation and emphasis omitted). Of course, "[a]ny such harm should be identified specifically." *Id.* (quotation and emphasis omitted). "In assessing prejudice in this context, we need not determine with certainty whether the outcome would have been different, but rather whether the claimed harm potentially affected the outcome of the proceedings." *Ramirez-Alejandre v. Ashcroft*, 320 F.3d 858, 875 (9th Cir. 2003) (en banc).

Accordingly, Circu asked the BIA to remand her case to the IJ so that she could present rebuttal evidence. Because the BIA summarily affirmed the IJ's decision — and consequently we review the IJ's decision as the agency's final decision — the denial of procedural due process requires that we remand the case to the BIA with directions that it remand the case for further proceedings before the IJ.[4]

## IV.   CONCLUSION

For the foregoing reasons, the petition for review is **GRANTED** and the matter is **REMANDED** with instructions that the BIA remand the matter to the IJ to provide Circu with an opportunity to respond to the 1999 Report.

---

[4]As the BIA summarily affirmed the IJ under its streamlining regulations, we neither suggest nor have occasion to consider whether under other circumstances the BIA may cure an IJ's denial of procedural due process by accepting new evidence in the course of an appeal. Further, Circu's claim that the use of streamlined procedures violated her due process rights is foreclosed by *Falcon Carriche*. 350 F.3d at 851. Circu also contends that the IJ erred by failing to consider her eligibility for a humanitarian grant of asylum, but the record is clear that the IJ considered this form of relief and found that it would not be inhumane to repatriate Circu.

# APPENDIX

| *1997 Report* | *1999 Report* |
|---|---|
| The Constitution provides for religious freedom, and the Government generally does not impede the observance of religious belief. However, several *Protestant denominations, Jehovah's Witnesses the most prominent among them,* continued to make credible allegations that low-level government officials and Romanian Orthodox clergy *harassed them* and impeded their efforts at proselytizing *and worship*. Under the provisions of 1948 *and 1989* decrees, the Government recognizes *15* religions; only the clergy of these recognized religions are eligible to receive state financial support. *The State Secretariat for Religious Affairs has licensed 385 other faiths, organizations, and foundations as religious associations under two 1924 laws on* | The Constitution provides for religious freedom, and the Government generally does not impede the observance of religious belief. However, several *denominations* continued to make credible allegations that low-level government officials and Romanian Orthodox clergy impeded their efforts at proselytizing. *The press reported several instances when adherents of minority religions were prevented by others from practicing their faith, and local law enforcement authorities did not protect them. . . .* Under the provisions of *a 1948 decree*, the Government recognizes *14* religions; only the clergy of these recognized religions are eligible to receive state financial support. . . . *The Government requires religious groups to register and establishes the criteria* |

| | |
|---|---|
| *juridical entities, thereby entitling them to juridical status as well as to exemptions from income and customs taxes. However, religious associations may not build churches or other buildings designated as houses of worship and are not permitted to perform rites of baptism, marriage or burial.* . . . The Romanian Orthodox Church has attacked the "aggressive proselytism" of Protestant and neo-Protestant groups *and harassed members of such religious minorities.* | *for registration. In order to be recognized as a religion, groups must register with the State Secretariat for Religious Affairs and present a list with the names, age, identity card numbers, addresses, and signatures of their followers.* . . . The Romanian Orthodox Church has attacked the "aggressive proselytism" of Protestant and neo-Protestant groups. |