## MATTER OF CHEN

### In Deportation Proceedings

### A-26219652

*Decided by Board April 25, 1989*

(1) An applicant for asylum under section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158 (1982), may establish his claim by presenting evidence of past persecution in lieu of evidence of a well-founded fear of persecution.

(2) Where an alien has shown that he has been persecuted in the past on account of race, religion, nationality, membership in a particular social group, or political opinion, the likelihood of present persecution then becomes relevant as to the exercise of discretion, and asylum may be denied as a matter of discretion if there is little likelihood of present persecution.

(3) Where past persecution has been established by an applicant for asylum, the Service ordinarily will be obliged to present, as a factor militating against a favorable exercise of administrative discretion, evidence that little likelihood of present persecution exists, or the presiding official(s) may take administrative notice of changed circumstances in a country.

(4) A favorable exercise of administrative discretion in an asylum application may be warranted for humanitarian reasons notwithstanding the fact that there is little likelihood of future persecution.

CHARGE:

Order: Act of 1952—Sec. 241(a)(2) [8 U.S.C. § 1251(a)(2)]—Nonimmigrant—remained longer than permitted

ON BEHALF OF RESPONDENT:  
Pravin J. Patel, Esquire  
Ronald W. Freeman, Esquire  
335 Broadway  
New York, New York 10013

ON BEHALF OF SERVICE:  
David M. Dixon  
Appellate Counsel

Michael Rocco  
General Attorney

BY: Milhollan, Chairman; Dunne, Vacca, and Morris, Board Members. Concurring Opinion: Heilman, Board Member.

This case was before us on October 14, 1988, when we sustained the respondent's appeal from an immigration judge's November 1, 1984, decision finding the respondent deportable and denying his applications for asylum, withholding of deportation, and voluntary departure.

We granted the respondent's application for asylum. The Immigration and Naturalization Service requested that execution of our decision and order be stayed pending consideration of a motion to reconsider. We granted this request on October 21, 1988. On November 16, 1988, the Service filed a motion to reconsider in which it asks that we change or clarify certain aspects of our October 14, 1988, decision. The Service motion to reconsider will be granted. Upon reconsideration, the respondent's appeal will again be sustained and his application for asylum granted.

The respondent is a 31-year-old native and citizen of China. He was admitted to the United States on November 23, 1980, as a nonimmigrant student. He was authorized to remain in this country until August 31, 1982, but remained beyond that time. On April 26, 1984, an Order to Show Cause, Notice of Hearing, and Warrant for Arrest of Alien (Form I-221S) was issued against him charging him with deportability as an overstay under section 241(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2) (1982). At a deportation hearing held on September 28, 1984, the respondent admitted that he was deportable as charged. The issue at the hearing, and the issue on appeal, involves the respondent's applications for asylum and withholding of deportation.

An alien who is seeking withholding of deportation from any country must show that his "life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 243(h)(1) of the Act, 8 U.S.C. § 1253(h)(1) (1982). In order to make this showing, the alien must establish a "clear probability" of persecution on account of one of the enumerated grounds. *INS v. Stevic,* 467 U.S. 407, 413 (1984). This clear probability standard requires a showing that it is more likely than not that an alien would be subject to persecution if returned to the country from which he seeks withholding.

In order to establish eligibility for a grant of asylum, an alien must demonstrate that he is a "refugee" within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1982). *See* section 208 of the Act, 8 U.S.C. § 1158 (1982). That definition includes the requirement that an alien demonstrate that he is unwilling or unable to return to his country because of "persecution or a well-founded fear of persecution" on account of race, religion, nationality, membership in a particular social group, or political opinion. Case law has focused primarily on the meaning of "well-founded fear," and the Supreme Court has held that a well-founded fear of persecution may be established upon a lesser showing than the clear probability of persecution which must be shown under section 243(h). *INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987). Adopting the view of the

United States Court of Appeals for the Fifth Circuit, we have held in *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), that an applicant for asylum has established a well-founded fear if he shows that a reasonable person in his circumstances would fear persecution. *See Guevara Flores v. INS*, 786 F.2d 1242 (5th Cir. 1986); *see also Carcamo-Flores v. INS*, 805 F.2d 60 (2d Cir. 1986).

Alternatively, eligibility for asylum may be established by a showing of past persecution. There has, heretofore, been less emphasis in the courts and within this Board on situations where past persecution is the main, or only, basis for an asylum applicant's claim. However, it is clear from the plain language of the statute that past persecution can be the basis for a persecution claim, and the case law has acknowledged this, if not focused on it. *See Desir v. Ilchert*, 840 F.2d 723, 729 (9th Cir. 1988); *Blanco-Comarribas v. INS*, 830 F.2d 1039, 1043 (9th Cir. 1987); *cf. INS v. Cardoza-Fonseca, supra*, at 1218. Similarly, Immigration and Naturalization Service Operations Instruction 208.4 and the Service Worldwide Guidelines for Overseas Refugee Processing ("Guidelines") recognize that past persecution and a well-founded fear of persecution are alternative methods of establishing eligibility for refugee status. The Guidelines specifically point out that "where a person claims *to have been persecuted,* he need only establish that objective fact," whereas "where a person claims a *fear of persecution,* subjective and objective elements are involved. The subjective condition of the person's fear relates to his feelings and perceptions based on his experience or his assessment of future harm." Guidelines, *supra*, at 10 (emphasis added).

If an alien establishes that he has been persecuted in the past for one of the five reasons listed in the statute, he is eligible for a grant of asylum. The likelihood of present or future persecution then becomes relevant as to the exercise of discretion, and asylum may be denied as a matter of discretion if there is little likelihood of present persecution. Where past persecution is established by the applicant, the Service ordinarily will have to present, as a factor militating against the favorable exercise of discretion, evidence that there is little likelihood of present persecution, or the immigration judge or this Board may take administrative notice of changed circumstances in appropriate cases, such as where the government from which the threat of persecution arises has been removed from power.[1] Thus, a rebuttable presumption arises that an alien who has been persecuted in the past by his country's government has reason to fear similar persecution in the future.

---

[1] We note that section 208(b) of the Act recognizes that conditions may change, and that an asylum grant may be terminated due to changed circumstances.

However, there may be cases where the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution. That victims of past persecution should in some cases be treated as refugees or asylees even when the likelihood of future persecution may not be great has been recognized by the Office of the United Nations High Commissioner for Refugees, in *The Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva, 1988). There, referring to a "general humanitarian principle," it is written:

> It is frequently recognized that a person who—or whose family—has suffered under atrocious forms of persecution should not be expected to repatriate. Even though there may have been a change of regime in his country, this may not always produce a complete change in the attitude of the population, nor, in view of his past experiences, in the mind of the refugee.

*Id.* at § 136. Thus, while the likelihood of future persecution is a factor to consider in exercising discretion in cases where an asylum application is based on past persecution, asylum may in some situations be granted where there is little threat of future persecution. Moreover, as with any case involving the exercise of discretion, all other factors, both favorable and adverse, should also be considered, with recognition of the special considerations present in asylum cases. *See Matter of Pula*, 19 I&N Dec. 467 (BIA 1987). It is in the contexts of all these factors that we view the respondent's claim.

The respondent testified at the hearing that both he and his family were persecuted in China during the so-called Cultural Revolution, from approximately 1966 through the mid-1970's. The respondent also submitted a lengthy statement in conjunction with his Request for Asylum in the United States (Form I-589). The immigration judge found the respondent's descriptions of the events of those years credible, and we find no reason to doubt that judgment. The respondent's testimony and statement reflect the following.

The respondent is the son of Oikai Chen, who was a Christian minister in China. In the fall of 1966, when the Cultural Revolution began, the respondent's father became a target of the Red Guards. He was forbidden from continuing his ministry and his income was terminated. Near the end of the year, the Red Guards ransacked the respondent's home, destroying walls and furniture and confiscating papers and personal effects. The respondent's father became a prisoner in the building of the Young Men's Christian Association. In the coming months, his father was dragged through the streets in a humiliating fashion over 50 times and was daily required to write confessions of his crimes. In November of 1967, during a Bible burning crusade, the respondent's father was pushed into a bonfire of

19

Bibles. He was badly burned but survived. The respondent's father continued to suffer a harsh fate at the hands of the Red Guards in the ensuing years, and he died in 1974, at the age of 46.

The respondent himself was 8 years old when the Cultural Revolution began. When his home was ransacked in late 1966, he was locked in a room with his grandmother and kept there for over 6 months. He was not allowed to attend school and was interrogated on a continuing basis. When he cried, the Red Guards kicked and bit him and deprived him of food. In mid-1967, he was released from the house arrest and returned to school. However, the respondent stated that because of his family background, he was abused and humiliated. On one occasion, he fell asleep during a speech regarding the need to criticize one's parents. Rocks were thrown at him. They struck his head and he suffered a serious loss of blood. His injuries required a month of intensive treatment.

In 1970, and again in 1972, the respondent was sent to rural villages for reeducation. He was harshly treated and denied medical care for a bad cut to his leg in 1970, and for a month-long high fever he suffered in 1972, which was caused by abusive treatment. On another occasion, the respondent was locked in a closet for 5 hours when he was unable to write the extensive criticism of his father demanded by one of his teachers. From 1973 to 1975, the respondent endured a number of exiles designed to "reeducate" him. The respondent stated that he was eventually allowed to support himself as a substitute teacher or handyman, but that from 1976 until his 1980 departure from China, he lived in "complete social isolation," and that as the son of a Christian minister, he could "never outlive [his] status as a pariah, an outcast, an 'unrepentent' element."

The respondent stated that because of the events described, he is physically debilitated, must wear a hearing aid due to his head injury, is always anxious and fearful, and is often suicidal. The respondent testified that he would kill himself if forced to return to China.

The immigration judge found that the respondent's fears were real. However, he concluded that the "leniency of the present Government of China to mere religious activity does not permit a finding of well-founded fear" of persecution in the future.

It seems beyond dispute that the respondent has in fact suffered persecution in China. However, it is also true that, since the time of the Cultural Revolution, conditions in China have changed significantly. We note in this regard that millions of people suffered during the Cultural Revolution and have since been rehabilitated. The current leader of China, Deng Xiaoping, was himself persecuted during that time, sent to the countryside, and forced to perform manual labor. While religious freedom as we understand it may still not be enjoyed in

China, we are not persuaded by the evidence presented that a reasonable person in the respondent's circumstances would have a well-founded fear of persecution on account of his religion, if returned to the China of 1989. We therefore agree with the immigration judge that the respondent has not met his burden of establishing a well-founded fear of persecution.

As discussed above, however, our determination that the respondent has not established a well-founded fear of present or future persecution is not in itself determinative, since we have found that the respondent has clearly established that he and his family were severely persecuted in the past in China. The detailed descriptions provided by the respondent regarding what his family endured during the Cultural Revolution indicate that their strong religious convictions caused them even more than the usual amount of ill-treatment during that turbulent period. Based on our discussion above, we therefore find that he is statutorily eligible for asylum.

We further conclude that asylum should be granted in this case in the exercise of discretion. While conditions in China have changed since the time the respondent was persecuted, the basic form of government there has not changed, human rights are still sometimes abused, and there is little religious freedom. The respondent is closely identified with a religious family. While he may not have a "well-founded fear" of future persecution in China, we do not think that all chance of persecution on account of his religion has been eliminated by the change in regime since the Cultural Revolution. Moreover, it is evident that the respondent still genuinely fears returning to China. Given what happened to his father, and given the manner in which he spent much of his boyhood, his fear of repatriation is understandable. The respondent has now lived in the United States for over 8 years. He has no close family remaining in China. His one sibling, a brother, lives in Hong Kong, but the respondent spent only 1 week there while en route to this country. The only adverse factor in this case is the likelihood that the respondent intended to abandon his residence in China and remain in the United States permanently at the time he was admitted to this country as a nonimmigrant student in 1980. *See* section 101(a)(15)(F) of the Act, 8 U.S.C. § 1101(a)(15)(F) (1982). However, we do not consider this factor controlling for the reasons set forth in *Matter of Pula, supra.* Having carefully considered all the circumstances, we find that a favorable exercise of discretion is warranted in this case. The respondent's application for asylum will therefore be granted.

In its motion to reconsider, the Service does not appear to seriously contest our finding that the respondent in this case should be granted asylum. However, it expresses the concern that our approach to the

issue of past persecution, including our consideration of humanitarian factors, is overly broad and will lead to "endless litigation" and "frivolous claims." As discussed above, we believe that past persecution can form the basis for an asylum claim under the statute. When such claims are made, we believe they can best be handled on a case-by-case basis. We shall not attempt at this time to delineate the circumstances under which past persecution may or may not be the basis for a successful asylum claim.

Inasmuch as we are granting the respondent's application for asylum, we find it unnecessary to rule on his application for withholding of deportation. *See Matter of Mogharrabi, supra.* Accordingly, the following orders will be entered.

**ORDER:**    The motion to reconsider is granted.

**FURTHER ORDER:**    The appeal is sustained.

**FURTHER ORDER:**    The application for asylum is granted.

*CONCURRING OPINION:* Michael J. Heilman, Board Member

I respectfully concur.

The important holding in this case is that a person who establishes past persecution may still be granted asylum for humanitarian reasons even where there is little or no evidence of the present possibility of persecution. As the majority notes, this Board issued a decision on this issue to which the Service took exception and subsequently submitted a motion to reconsider to this Board.

Unlike the majority, I would not have granted the motion to reconsider. The Service in its motion presented the argument that it could not "believe that Congress intended that past persecution could be the basis" for an asylum grant. There was no reference to legislative history or any other authority for this proposition. In addition, the Service did not state how its position in this case could be reconciled with the interpretation it has applied for approximately 6 years in the Refugee Processing Guidelines, in which it has clearly applied the same interpretation as the Board. Because the motion was deficient in these respects, I would not have granted it.

As to the particular circumstances of this case, the majority opinion solely discusses the testimony of the respondent. From this the mistaken impression might be drawn that there is nothing else in the record upon which this decision might be based. There are both a fairly detailed advisory opinion from the Bureau of Human Rights and Humanitarian Affairs of the Department of State and a Country

Reports on Human Rights Practices ("Country Reports")[1] in the record. The advisory opinion states that the respondent does not have a well-founded fear of persecution. This conclusion is interesting, but the opinion itself, in its factual dissertation, leaving aside its gratuitous legal analysis, unintentionally substantiates the respondent's claim, or at a minimum, gives it a plausible context. It is clear from the information provided there that widescale persecution occurred in China during the period in which the respondent and his family suffered severe ill-treatment, according to his detailed testimony.

The Country Reports also provide evidence of both past and on-going religious persecution. It is clear from this document, for instance, that prior to 1981, religious worship was forbidden, and that almost all places of worship were confiscated and turned into factories, and military and governmental facilities. Institutions for religious training were closed during that time. At the present, persons who practice any religion are "normally not allowed to join the Communist Party" and so are excluded from "many of the material, career, and other benefits" which accrue to membership. Country Reports, *supra*, at 748. This in turn "exerts a strong pressure against religious commitment." *Id.* The right to religious freedom only applies to persons over 18 years of age. All religious denominations are controlled by the state and all "legally-recognized" religions must be affiliated with state-organized religious bodies. *Id.* at 749. In order to attend church, a person must obtain a pass issued by local authorities. Participation in "unofficial clandestine 'house churches'" is forbidden, and reports of arrests of persons who have done so is noted. *Id.*

Given this information, even if one finds that the governmental policies toward religious belief and practice have changed considerably since 1981, the situation in China is far from certain. If indeed four Catholic priests were sentenced for "subversion" to 15 years in prison for maintaining relations with the Vatican, as the Country Reports states, I for one will express serious doubts as to the extent of religious freedom in China at present, and no great confidence that the very recent past will not be repeated.

In these circumstances, since the respondent has been found to have suffered badly because of his religious affiliation and his family relationship to a minister of religion, there is good reason not to require him to return to China. This approach, aside from being consistent with the language of the Refugee Act of 1980,[2] also puts the United States in conformance with the United Nations Convention

---

[1] 1983 Country Reports on Human Rights Practices, Joint Committee of the Senate and House of Representatives, 98th Congress, 2d Session (1984).

[2] Pub. L. No. 96-212, 94 Stat. 197.

23

and Protocol Relating to the Status of Refugees,[3] a generally understood principle of interpretation of the Refugee Act of 1980. *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985), *modified on other grounds*, *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). As the majority points out in its discussion of the applicability of the Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Geneva, 1979), the Convention is interpreted by the United Nations High Commissioner for Refugees to apply to past victims of persecution. It bears emphasizing in addition that at the time the Convention came into effect, the majority of the refugees covered by the Convention were victims of past persecution in Europe, which persecution clearly had ceased with the defeat of the Axis powers. It is thus apparent to me that the historical underpinnings of the Convention, from which the Refugee Act of 1980 receives its genesis, would have to be totally ignored if one were inclined to adopt the position that present likelihood of persecution is also required where past persecution has been established. It would also be necessary to ignore the further fact that the United States has been operating an extensive refugee program for Cambodians whose claim to refugee status is solely based on persecution by the regime of Pol Pot, which was driven out of power in December 1978 by a Vietnamese invasion.

For these reasons, I would also sustain the appeal.

---

[3]United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150; United Nations Protocol Relating to the Status of Refugees, January 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.