Miron Florin MARCU, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 96–70881.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 2, 1998.

Decided June 26, 1998.

---

John R. Alcorn, Susan E. Schultz, Lois S. Laughlin, Law Offices of John R. Alcorn, Newport Beach, California, for the petitioner.

Nelda C. Reyna, Office of Immigration Litigation, Civil Division, Department of Justice, Washington, DC, for the respondent.

Before: WALLACE, TROTT, and HAWKINS, Circuit Judges.

Opinion by Judge WALLACE; Dissent by Judge MICHAEL DALY HAWKINS.

WALLACE, Circuit Judge:

Miron Florin Marcu, a citizen of Romania, petitions for review of the Board of Immigration Appeals' (BIA) denial of his application for asylum and withholding of deportation. We have jurisdiction to hear this petition pursuant to 8 U.S.C. § 1105a(a), and we deny the petition.

Because this petition was filed prior to the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009–546, we do not apply its provisions regarding the scope of judicial review. *See Kalaw v. INS,* 133 F.3d 1147, 1150 (9th Cir.1997).

I

We present the facts as accepted by the BIA, which were based on the immigration judge's findings. Marcu was born in 1942 in Romania, to a Romanian father and a mother who was a United States citizen. He asserts that his mother's citizenship was the cause of Romanian government persecution.

When a communist regime took control of the Romanian government in 1945, most of Marcu's family's possessions were confiscated. The family managed to keep its main home, which also served as an office of the United States Department of State. This office, known as the "United States legacy," remained in place until 1949, after which the Romanian government put "pressure against [his family]."

The government then moved Marcu's family into "a small room, 10 feet by 12 feet, with no facilities, no water, no anything, only a room." Marcu's mother was detained by local police, who sought her renunciation of her U.S. citizenship. When she refused to do so, she was imprisoned.

As a child, Marcu was taunted by other children due to his mother's ties to the United States. When he finished high school, he applied to a university, but his application was lost repeatedly, and he ultimately settled for attending a technical trade school. At the trade school, a teacher denounced him as an "enemy of the people."

Marcu was interrogated by police and beaten in 1964 for listening to Radio Free Europe and in 1968 for wearing jeans made in the United States. In 1970 and in the early 1980s, he was detained and questioned by the police a number of times and his home was searched repeatedly. Although his first wife was allowed to emigrate to the United States in 1984, he was denied permission to visit her. They were later divorced.

In 1990, Marcu applied again for a visa to visit the United States. Local police detained him, beat him to the point of unconsciousness, and threatened him: "We take care of the enemy of the people. We take care, we shut their mouth. This means we kill them."

After Marcu arrived in the United States with his second wife, local police came to his Romanian house and questioned his mother-in-law about his visit and his anticipated return date. The police also warned her to disassociate herself from Marcu because of his ties to the United States.

Marcu has conceded deportability and the only issues are whether he should be granted asylum or have his deportation withheld. The immigration judge assigned to the case held a hearing on December 21, 1993, at which time Marcu and the Immigration and Naturalization Service (INS) presented evidence. On March 14, 1994, the immigration judge denied relief. Marcu appealed to the BIA, which affirmed the immigration judge on September 24, 1996, holding that Marcu was not eligible for asylum because he did not have a well-founded fear of future persecution, given the massive governmental changes in Romania in the past decade.

II

■ Marcu first petitions for review on the ground that the BIA's determination of ineligibility for asylum is not supported by substantial evidence. Our review of the BIA's determination of ineligibility for asylum is extremely narrow. That determination must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4). This is a highly deferential

standard of review. "To reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it...." *INS v. Elias–Zacarias*, 502 U.S. 478, 481 n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (emphasis in original).

 "To establish eligibility on the basis of a 'well-founded fear of persecution,'" Marcu must demonstrate both an objectively reasonable and subjectively genuine fear. *Fisher v. INS*, 79 F.3d 955, 960 (9th Cir.1996) (en banc) (*Fisher*). If an applicant demonstrates that he has suffered past persecution, a rebuttable presumption of a well-founded fear of future persecution will be triggered. *See* 8 C.F.R. § 208.13(b)(1)(i). The INS can rebut this presumption by showing, by a preponderance of the evidence, that conditions "have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return." *Id.*

██ In this case, the BIA appeared to assume that Marcu had demonstrated subjectively genuine fear of future persecution. It held, however, that he had failed to demonstrate objectively reasonable fear of such persecution and thus was not eligible for asylum.

We must determine whether the evidence present in this record *compels* reversal of the BIA's determination of ineligibility. That is the only issue before us. It was unnecessary for the BIA to discuss the finding of the immigration judge that Marcu had suffered harassment and discrimination, but had failed to prove these acts to be government persecution. The reason the BIA did not need to make a finding on whether Marcu had demonstrated past persecution was because even if past persecution were demonstrated, triggering a presumption that Marcu has a well-founded fear of future persecution, 8 C.F.R. § 208.13(b)(1)(i), the BIA found that the INS had rebutted the presumption successfully.

Like the BIA, we need not decide whether Marcu suffered government persecution or merely some police harassment, mistreatment, etc. that is discriminatory but not official government persecution. *See generally Fisher*, 79 F.3d at 961. We assume for purposes of our decision that Marcu has shown past persecution, and proceed to determine whether there is substantial evidence in the record to support the BIA's conclusion that the INS successfully rebutted the presumption of future persecution.[1]

In holding that the presumption was rebutted, the BIA relied primarily on a letter from the United States Department of State, signed by Roger Dankert, Director of the Office of Asylum Affairs in the Bureau of Human Rights and Humanitarian Affairs. Director Dankert made his own analysis and enclosed a four-page report prepared by the Bureau that described the sweeping changes that had occurred in Romania since the overthrow of Ceausescu. According to that report, "current conditions have so altered as to remove any presumption that past mistreatment under Ceausescu or in the chaotic first year after his overthrow will lead to mistreatment in the future." We have previously described these country reports as "'the most appropriate and perhaps the best resource' for 'information on political situations in foreign nations.'" *Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir.1995), *quoting Rojas v. INS*, 937 F.2d 186, 190 n. 1 (5th Cir.1991). This makes sense because this inquiry is directly within the expertise of the Department of State.

Based on this letter and enclosed report, the BIA concluded that, while Marcu may have suffered from past persecution during the communist regime, the conditions had changed sufficiently so that he no longer had a well-founded fear of persecution. The report provides substantial support for this conclusion. Although Marcu was detained and beaten by police agents in 1990, this incident—the first such incident in several years—occurred during the "chaotic first year" mentioned in the report. There are no

---

1. Because we assume that Marcu has suffered past persecution, it is unnecessary to recount all of the details of his life, as the dissent does. The dissent's additions neither strengthen our as- sumption of past persecution nor shed any light on the relevant issue in this case, which is whether the INS has successfully rebutted the presumption of *future* persecution.

alleged abuses after that time, which is completely consistent with the Department of State report.[2]

Moreover, the Department of State report was individualized to Marcu's situation. Director Dankert's letter stated that the Department's conclusions were based on an "analysis of country conditions and other relevant factors, plus an evaluation of the specific information provided in the application." Based on this, he stated:

The applicant is not correct in stating that there has been "no real change in the Romanian Government" since he left. He is also incorrect in stating that his U.S. connections would be a basis for retribution against him. We see no reason why the applicant could not reside tranquilly in Romania.

Director Dankert's analysis thus provides substantial support for the BIA's determination that the INS had rebutted the presumption of future persecution. Indeed, as the BIA pointed out in its opinion, the documentary evidence Marcu submitted in some ways confirms the country report's observation that the conditions in Romania have changed noticeably. *See, e.g., International Human Rights Law Group*, cited in 139 Cong. Rec. S14220 (daily ed. Oct. 21, 1993) ("The Law Group is pleased to note that the human rights situation in Romania has improved during the past year in several respects."); *Helsinki Watch*, cited in 139 Cong. Rec. S14218 (daily ed. Oct. 21, 1993) ("Although there have been significant improvements in many areas of concern to the Hungarian minority in Romania, tensions have remained high . . . .").

As the briefs filed in this case demonstrate, there is a factual dispute regarding the current conditions in Romania. We do not solve this dispute. Our task is to determine whether there is substantial evidence to support the BIA's finding, not to substitute an analysis of which side in the factual dispute we find more persuasive. As we have

already held that the country report from our Department of State is "the most appropriate" and "perhaps the best resource," we hold that the country report and Director Dankert's analysis provided substantial evidence for the BIA's determination that the INS successfully rebutted the presumption of future persecution.

### III

■ Marcu petitions for review on the alternative ground that he should be deemed eligible for asylum based solely on past persecution. In certain circumstances, the BIA may grant asylum for humanitarian reasons, based on past persecution alone, without the need for a showing of likelihood of future persecution. *See Acewicz v. INS*, 984 F.2d 1056, 1062 (9th Cir.1993), *citing Matter of Chen*, 20 I. & N. Dec. 16 (BIA 1989). The BIA based this possibility on the Handbook of Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees. *Matter of Chen*, 20 I. & N. Dec. at 19. There, reference was made to the circumstances of "a person who—or whose family—has suffered under atrocious forms of persecution should not be expected to repatriate." *Id.* Asylum may be considered in such cases even when there is little threat of future persecution. *Id.*

■ With regard to this claim, the BIA held: "[B]ased on the evidence at hand, we do not find sufficient humanitarian grounds to grant the respondent asylum as a matter of discretion. The actions were not so severe or atrocious in nature to warrant asylum for humanitarian reasons."

■ Although we require more than a mere comment from the BIA, "all that is necessary is a decision that sets out terms sufficient to enable us as a reviewing court to see that the Board has heard, considered, and decided." *Rodriguez–Matamoros v. INS*, 86 F.3d 158, 160 (9th Cir.1996), *quoting*

---

2. The dissent contends that the BIA ignored part of the Country Report that states that "most plausible mistreatments cited by applicants are now local rather than national authority in origin." What the dissent does not quote is the next clause, which states that such mistreatment "can be averted . . . by recourse to the nascent democratic legal structures rather than by recourse to seeking political asylum abroad."

*Villanueva–Franco v. INS,* 802 F.2d 327, 330 (9th Cir.1986).

The BIA set forth in its opinion an extensive description of the harassment and abuse Marcu endured during his time in Romania. In the BIA's judgment, however, that harassment and abuse did not rise to the necessary level of severity or atrociousness to warrant asylum on humanitarian grounds. The BIA's opinion demonstrates that it heard the claim, considered the evidence, and decided against Marcu. No more was required. Therefore, we hold that the BIA did not abuse its discretion in holding that Marcu was not eligible for asylum based solely on past persecution.

### IV

Because we hold that Marcu has not demonstrated that the evidence presented to the BIA would compel a finding that he was eligible for asylum, we hold that he is not entitled to the withholding of deportation. *See Berroteran–Melendez v. INS,* 955 F.2d 1251, 1258 (9th Cir.1991).

PETITION DENIED.

MICHAEL DALY HAWKINS, Circuit Judge, dissenting:

I must dissent. Miron Florin Marcu ("Marcu"), the son of a United States citizen, was persecuted for over 45 years by local Romanian officials because of his loyalty to and identification with the United States. The persecution began when the Iron Curtain descended over Central and Eastern Europe and continued well after the collapse of the Communist regime in Romania. When Marcu sought asylum in this country, the INS presented only the barest defense: it asked not a single question of Marcu or his witness, it presented no witnesses to contradict Marcu's detailed and corroborated testimony, and it introduced no documentary evidence other than a State Department cover letter and four-page country report. Even this report conceded that persecution of the type experienced by Marcu persists in local areas of Romania.

### I.

Because the majority's description of the facts omits or downplays many of the significant events in Marcu's life, I recount them here, as they were received in uncontradicted fashion.

Marcu's mother, Florence Sebatini, was born and raised in the United States. When Florence was fourteen, the family moved to Romania. An older sister, Margaret Darin, remained in the United States and currently lives in Florida. Margaret provided substantial financial and emotional support to Marcu and his mother throughout the years. Marcu was born in Romania in 1942.

In 1945, a Communist dictatorship came to power in Romania. The government expropriated most of the family's wealth and property, except for the family home in Constanta.

In 1946, Florence contracted with the U.S. State Department to establish a "U.S. Legation," a small diplomatic office of the U.S. embassy, in the family home. Thus, the Marcu home displayed the American flag and bore the diplomatic emblem of the United States. Marcu's father died in 1947. When the American Consulate left in 1949, the Romanian government confiscated the home and the family's remaining possessions. Marcu, his mother, and his grandmother then lived in a small room with no light, facilities, or water.

On many occasions, Florence was detained, interrogated, and pressured to renounce her U.S. citizenship by local police. In April 1950, the police accused her of being an American spy and arrested and imprisoned her without a trial. She was hung upside down for hours and forced to engage in degrading acts. Continually questioned about being an American spy, she was sentenced to field labor at the working camps of Popesti Leordeni prison. Finally, at gunpoint, Florence renounced her U.S. citizenship. She was released from the labor camps in December 1952 in poor health.[1] Although forbidden to work, she earned mon-

---

1. The Certificate of Release states she was convicted by the General Directory of State Security, a division of the Ministry of Internal Affairs, for the crime "Manifest against the Regime."

ey for the family by secretly teaching English and music.

During Florence's imprisonment, Marcu and his grandmother subsisted on a pension of $7 a month and the secret charity of neighbors. Children threw rocks at Marcu and shouted, "Hey you, American, stay away from us." On several occasions, Marcu was taken to the school office and questioned about which neighbors were helping them, what his grandmother was teaching him, and what his family thought about the Romanian government. During these questionings, the police continually referred to the 10–year–old Marcu and his family as Americans.

After Florence's release from prison, the family continued to live in poverty. Local police regularly searched their living quarters, looking for anti-government books, newspapers, or letters. Repeatedly removed from school and questioned by police, Marcu interrupted his education for one year to work to support the family.

Upon completing high school, Marcu applied to attend a six-year university. His application was repeatedly lost and, eventually, he was denied admission. He was told that "[w]ith your background, you don't expect to be in a college." While attending a three-year technical school, an instructor accused Marcu, in open class, of being "an enemy of the people." During these school years, he was repeatedly detained and questioned about his political leanings.

Most of Marcu's adult life has been filled with incidents of detentions, interrogations, and beatings—all based on his and his family's support for principles of American freedom. In 1964, Marcu and other co-workers listened to Radio Free Europe and The Voice of America at work. After being turned into police by a co-worker, Marcu was taken to the police station and beaten. He was accused of being an "enemy of the people" and an "instigator." During the next few years, Marcu and Florence were repeatedly arrested, detained, and questioned. Florence's letters to her sister, Margaret, who was living in the United States, were intercepted. Marcu later learned that Margaret wrote many letters to Florence, which she never received. In 1968, a local police officer beat and kicked Marcu for wearing U.S.-made blue jeans.

Two years later, Marcu married Carmen Nicoliscu, an architect. For the next several years, their home was searched two to three times a week. At least once a month, police detained Marcu at the police station and questioned him about listening to "subversive" radio programs, his contacts with American relatives, and his allegiance to the Romanian government. These interrogations were typically followed by Marcu being threatened with death and beaten with rifle butts.

In 1977, Marcu was arrested and detained after being accused of instigating labor strikes. For over 36 hours, he was denied food and water and repeatedly beaten. At the end of the interrogation, he was forced to write all the information he knew about his family. Later that year, Florence died.

From 1980–1983, Marcu's home was repeatedly searched. He was arrested and beaten in 1983 because he was not "acting like a good Communist."

In 1984, Carmen received a passport to travel to Florida to visit Margaret. Marcu was denied a passport. Upon arriving in the United States, Carmen requested and received political asylum. Romanian police, upon learning of his wife's defection, went to Marcu's workplace and, in front of his co-workers, demanded that Marcu divorce her.

From 1985–1987, the harassment and persecution of Marcu escalated. Initially, he was interrogated weekly by police. They threatened to kill him if he tried to follow Carmen to the United States and pressured him to divorce her. He was beaten approximately twelve times with socks filled with sand. Although he made discreet inquiries into ways to flee Romania, he was unable to escape. Soon, the detentions and interrogations occurred almost daily.

In 1987, two employees from the U.S. Embassy—sent through the efforts of Margaret—went to Marcu's house and asked him if he wished to join his wife in the United States. Local Romanian labor officials learned of the visit in advance and threat-

ened to kill Marcu if he said the "wrong" things. Marcu declined the offer to come to the United States because the Romanian officials were in the room during the visit. After this, Marcu gave up hope of reuniting with Carmen in the United States and divorced her in July 1987.

Soon thereafter, Marcu married Daniela Safta. For the next two years, police continued to search their house several times each week.

In December 1989, the Communist dictatorship of Nicolae Ceausescu was overthrown. In May 1990, Marcu was able to bribe a local police officer, the husband of a co-worker, to push through his application for a passport. He also applied for a U.S. visa.

The next month, police called Marcu to the local station, on the pretense that he had witnessed a car accident. He was taken into a small room where three police officers beat him with rifles until he was unconscious. He awoke in his car, at three o'clock in the morning, in an unfamiliar part of Constanta. His legs were bruised, as if the car doors had been slammed shut on them. Blood was running down the right side of his head and ear; there was also blood in his urine. He could not find a doctor to treat him for three days. When he finally received treatment at the Constanta Municipal Hospital, a doctor diagnosed "post traumatic hematomegalie and multiple cranial injury." [2]

In September 1990, he received a U.S. visa and came to the United States with Daniela. One week after his arrival, he applied for asylum, which was denied. [3] After he and Daniela overstayed their visitors' visas, the INS issued an Order to Show Cause in November 1992. After conceding deportability, Marcu again applied for asylum and withholding of deportation. The couple's daugh-

ter, Mary, was born in the United States in April 1993.

Marcu testified in English at the hearing before the IJ in March 1994. He also submitted substantial documentary evidence supporting his asylum claim: excerpts from the Congressional Record; reports from Amnesty International, the Hungarian Human Rights Foundation, and Helsinki Watch; and various American newspaper articles. [4] Finally, Marcu's mother-in-law, Victoria Safta—who lives in Marcu's house in Romania [5] —testified that police came to the house a few weeks after Marcu left and questioned her about Marcu's whereabouts and plans to return. Before her trip to the United States, she was questioned about her travel plans and warned to dissociate herself from Marcu. Victoria also reported several break-ins to the house.

The INS did not cross-examine Marcu or Victoria or present its own witnesses. In fact, counsel for the INS uttered a total of 37 words during the entire hearing. [6] The only evidence submitted by the INS was the State Department's advisory opinion and report on conditions in Romania.

## II.

The majority emphasizes the standard of review, as if to explain away this draconian result. Yet despite the majority's efforts, this is not a case in which we simply applied clear, though heart-wrenching, facts to a deferential standard of review. Instead, the majority breaks new ground by elevating the State Department's country report to talismanic heights and shifting decision-making authority from the BIA to a government bureaucrat.

I agree with the majority that the issue is whether there is substantial evidence in the

---

2. Marcu produced records of this hospital visit at the hearing before the IJ.

3. This first asylum application and the subsequent proceedings were not part of the record for our review.

4. All of the documents offered by Marcu were accepted by the IJ as evidence.

5. Marcu built this one-bedroom house in 1974 for $5,000, with $4,000 sent to him by Margaret.

6. The INS's "advocacy" consisted of the following statements: "Isabella Bronzina for the Government"; "No, Your Honor"; "I have no questions, Your Honor. Can we have a short recess"; "No questions, Your Honor"; "I have no questions, Your Honor"; "No, Your Honor"; "No, Your Honor"; "Waived."

record to support the BIA's conclusion that the INS successfully rebutted the presumption of future persecution.[7] Deference does not mean, however, that we must rubber-stamp every petition for review of the BIA's denial of an asylum petition. Rather, we must determine whether the Board's conclusion is "substantially reasonable" based on the record as a whole. *De Valle v. INS*, 901 F.2d 787, 790 (9th Cir.1990).

The evidence Marcu presented is so compelling that it is hard to believe that any reasonable factfinder could fail to find a well-founded fear of persecution. The only effort exerted by the INS in this case was its introduction of the State Department's report. The State Department attached its "generalized background sheet on Romanian applications," which is a compilation of foreign service officers' reports, the annual *Country Reports on Human Rights Practices*, the annual *World Refugee Report*, and periodic *Background Notes* on each country. While we have described these annual *Country Reports* as "the most appropriate and perhaps the best resource" for "information on political situations in foreign nations," *Kazlauskas v. INS*, 46 F.3d 902, 906 (9th Cir. 1995) (internal quotations and citations omitted), we have never held, until today, that the *Country Report* for a particular country or the State Department's advisory opinion is dispositive. The majority's opinion allows the BIA to abdicate its fact-finding function by merely including a few citations and pithy quotes from the country report in its analysis.

Here, the Board adopted the advisory opinion's conclusion while ignoring those portions of the report that supported Marcu's claim. The report, issued in December 1993, admitted the continued existence of civil rights abuses by local authorities: "most plausible mistreatments cited by applicants are now local rather than national authority in origin," and "[o]fficial mistreatment ... might occur in some localized circumstances." The BIA should not be free to pluck sweeping generalizations from State Department reports to support its conclusions, while ignoring specific statements in those reports that support an asylum seeker's petition.

The report also stated that Romania, "[o]nce the most repressive of the major Communist regimes," was currently led by many who "held office under the previous regime." Finally, the State Department admitted that Marcu's "connections with the United States may well have led to recurrent interest in him on the part of the authorities, particularly when his first wife did not return from a visit to this country in 1984." Taken as a whole, the advisory opinion insufficiently rebuts the regulatory presumption of future persecution to which Marcu is entitled.

The evidentiary scales tip decisively in Marcu's favor when a reasonable factfinder considers the evidence Marcu submitted.[8] Marcu introduced overwhelming documentary evidence that Romania's democratic transformation was superficial. The House of Representatives voted to deny most-favored-nation ("MFN") trade status to Romania in September 1992 in light of its civil rights abuses. Comments during congressional debate were varied but presented a common theme:

Romania represents the least change among all the countries of Eastern and Central Europe from the hated Communist dictatorships to what we have today. There is a persistent pattern of human rights violations involving all nationalities in Romania.... The anti-Communist revolution in Romania was hijacked by the remnants to the Romanian Communist

---

7. In my opinion, it is clear that Marcu is entitled to the regulatory presumption of eligibility for asylum. *See* 8 C.F.R. § 208.13(b)(1)(i). The cumulative effect of multiple incidents of discrimination, harassment, and violence may constitute persecution. *See Surita v. INS*, 95 F.3d 814, 819–20 (9th Cir.1996); *see also Gaya Prasad v. INS*, 101 F.3d 614, 617 (9th Cir.1996) (finding of past persecution is compelled when applicant was beaten by government captors and lost job due to political activism).

8. We reviewed the record as it was presented to the BIA in September 1996, which consisted of news reports and State Department records issued during 1992 and 1993. Thus, we did not consider the real and lasting democratic changes that have occurred in Romania under President Emil Constantinescu's leadership.

Party, and the present leader of the country, [Ion] Iliescu, is a barely reconstructed former Communist leader.... [U]nder Nicolae Ceausescu, Romania was the most despicable of all Communist dictatorships, and to a very large extent the basic power structure is unchanged in Romania today.... [T]he Romanian revolution has been hijacked by this regime now in power. They have changed their name. They have changed their facade. But the terror goes on.... Romania is not a democracy. Romania does not respect human rights. Romania does not respect religious rights of any religion. It does not provide for the degree of cultural autonomy that we take for granted in any civilized society. 138 Cong. Rec. H8851 (daily ed. Sept. 22, 1992) (statement of Rep. Lantos).

While Ceausescu is gone, vestiges of the old system do remain. Many of Romania's top leaders today held responsible party positions under Ceausescu and are not eager to discuss their pasts; more than half of the old Securitate [secret police] still make up the police, the army, and a new agency known as the Romanian Intelligence Service. *Id.* at H8853 (statement of Rep. Wolf).

[The Romanian] government ... is made up primarily of people who are recycled from the hated Ceausescu regime that has allied itself with the dangerous ultra-nationalist, the Romanian National Unity Party, which is the political arm of a neo-Fascist organization which has repeatedly attacked Romania's Hungarian, Jewish, and gypsy minorities. *Id.* at H8854 (statement of Rep. Atkins).

Unfortunately, [Romania] is not the democratic success like its neighbors in Hungary and Bulgaria. Serious questions remain today about the Iliescu government's commitment to democratic and economic reforms; holding genuinely free and fair elections; improving human rights and civil liberties; promoting an independent media; and placing strict, publicly ac-

countable civilian control over the Romanian Intelligence Service—the dreaded Securitate. Actions speak louder than words. And, thus far, the actions of the Iliescu government have not been satisfactory.... The Romanian Intelligence Service has made limited progress to divorce itself from Dictator Ceausescu's murderous Securitate. Intimidation remains. *Id.* at H8854 (statement of Rep. Atkins).

A year later, Congress voted to extend MFN status to Romania. The Senate stated it would continue to monitor developments in Romania in light of "[r]eports from a number of human rights organizations suggest[ing] ... there is still cause for concern and a tremendous need for improvement." 139 Cong. Rec. S15217 (daily ed. Oct. 21, 1993).

Marcu presented even more evidence. Statements from congressional representatives and reports from human rights organizations discussed the local abuse of civil rights, *see Helsinki Watch,* cited in 139 Cong. Rec. S14218 (daily ed. Oct. 21, 1993); the routine torture of detainees in police custody, *see Amnesty International,* cited in 139 Cong. Rec. S14219, S14220, *Hungarian Human Rights Foundation,* cited in 139 Cong. Rec. S14228; the lack of enforcement of civil rights, *see Helsinki Watch,* cited in 139 Cong. Rec. S14218; the intimidation and surveillance by the Romanian Intelligence Service,[9] *see Amnesty International,* cited in 139 Cong. Rec. S14221, *Hungarian Human Rights Foundation,* cited in 139 Cong. Rec. S14228, 138 Cong. Rec. H8850 (statement of Rep. Wolf), (statement of Rep. Lagomarsino); and the lack of independence of the judiciary, *see Amnesty International,* cited in 139 Cong. Rec. S14220. All of these reports post-dated Romania's democratic revolution.

The BIA dismissed all this evidence as "general in nature." Yet the evidence Marcu presented dwarfed the conclusion of the State Department's very general advisory opinion. In *Kazlauskas,* we upheld the

---

9. The State Department's report optimistically noted that a new law "has established parliamentary oversight over [the Romanian Intelligence Service] and prohibits the hiring of most former Securitate officers." However, more than half of

the old Securitate continued to comprise the police, the army, and the new intelligence agency, including its director. *See* 138 Cong. Rec. H8853 (daily ed. Sept. 22, 1992) (statement of Rep. Wolf).

BIA's exclusive reliance on the *Country Report* when it showed that Lithuania had completely replaced its leadership personnel and had discontinued many of the Soviet practices of surveillance and control. *See* 46 F.3d at 906. We concluded that the *Country Report* demonstrated the applicant did not have a well-founded fear of persecution because "[t]here had been no reports of conduct by the Lithuanian authorities similar to the repressive and abusive conduct by former Soviet authorities." *Id.* In contrast, the record before us is replete with reports of continued human rights abuses in Romania.

Curiously, the majority finds the tepid support for the BIA's conclusion offered by the country report "completely consistent" with the actual state of affairs because "[t]here are no alleged abuses" of Marcu after the "chaotic first year" of Romania's democratic revolution. Maj. op. 1081. The strange thing is—Marcu left Romania during the "chaotic first year." He sustained a life-threatening beating in June 1990 and left Romania in September 1990. The fact that Marcu did not stick around during this "chaotic first year" to see if the beatings would continue should not work against his claim.

The majority ignores the only other piece of evidence upon which the Board relied—the testimony of Marcu's mother-in-law. The BIA noted that Marcu's mother-in-law currently resides in Marcu's house in Romania in relative tranquility. Thus, the Board concluded, Marcu had no reason to fear persecution in his homeland. The BIA acknowledged, however, that "Romanian government officials may have expressed some interest as to [Marcu's] current whereabouts" and that Marcu's mother-in-law has been disturbed by "brief periods of questioning by the police." The logical question is obvious: why are the Constanta police still inquiring into Marcu's whereabouts if he has nothing to fear from them upon returning to Romania?

The majority concludes that the State Department's advisory opinion "was individualized to Marcu's situation," thus satisfying our requirement that the BIA engage in an individualized analysis of the applicant's circumstances when evaluating changed country conditions. *See Osorio v. INS*, 99 F.3d 928,

932–33 (9th Cir.1996). The majority is wrong in two respects. Our precedent requires the BIA and IJ, not the State Department, to conduct an individualized analysis. Moreover, the State Department's letter questions the plausibility of some of Marcu's claims and challenges Marcu's opinion of the extent of political change in Romania. We must, however, accept Marcu's testimony as true because neither the IJ nor the BIA made an adverse credibility finding. *See Hartooni v. INS*, 21 F.3d 336, 342 (9th Cir. 1994). And Marcu's personal opinion on the political climate in Romania is not relevant to his asylum claim. As a whole, this letter in no way purports to analyze whether Marcu has a well-founded fear of persecution in Romania based on his membership in a particular social group, his family. The majority opinion allows the BIA to escape its evaluative function by relying on the cursory letter of a government bureaucrat.

The BIA did not engage in the "individualized analysis" of Marcu's situation in Romania that we require when analyzing changed country conditions. The Board merely cited the State Department's report and noted that Romania had overthrown its Communist dictatorship in favor of a democratically-elected government that "in general" respects civil liberties. The BIA concluded by quoting this report: "current conditions have so altered as to remove any presumption that past mistreatment under Ceausescu or in the chaotic first year after his overthrow will lead to mistreatment in the future." The BIA reasoned that because Marcu's persecution had occurred under the Ceausescu regime and in 1990, Marcu no longer faced any reasonable possibility of persecution.

The BIA's analysis does not address Marcu's claim that he has a well-founded fear of persecution from local authorities whom the national government is unable or unwilling to control. Marcu has repeatedly argued, and submitted overwhelming evidence to prove, that while the changes on the national level in Romania have been fundamental, local governments are unchanged. It was local police who primarily tormented his family for 45 years. The State Department's report simply does not rebut the presumption that

Marcu has a well-founded fear of persecution from local authorities.

We have previously held that an applicant is not required to show a threat of country-wide persecution to be eligible for asylum or withholding of deportation. *See Harpinder Singh v. Ilchert,* 63 F.3d 1501, 1510 (9th Cir.1995). Once the regulatory presumption is triggered, "the only relevant question is whether conditions in the country have so changed that the threat no longer exists upon his return," not whether the applicant's "past experience reflected conditions nationwide." *Id.*

The majority asserts that considering all the evidence Marcu presented would involve this court in resolving a factual dispute about current conditions in Romania that was properly before the BIA. Maj. op. 1081. This case is not about resolving factual disputes or reweighing the evidence. It is about holding the BIA to its job, which is to apply the appropriate regulatory presumptions and weigh the evidence as a neutral fact-finder. And it is about requiring the INS to mount at least a minimal defense when it seeks to deport an asylum-seeker with a story of decades-long persecution to the worst of the former Communist regimes. Because Marcu presented compelling evidence that he has a well-founded fear of persecution if returned to Romania, I would grant the petition.

### III.

The BIA also abused its discretion in denying Marcu's asylum claim based on past persecution. The only analysis provided by the BIA was a statement that "[t]he actions were not so severe or atrocious in nature to warrant asylum for humanitarian reasons."

The BIA failed to include any analysis of *why* the 45–year torment of Marcu and his mother was not sufficiently severe or atrocious. *See Rodriguez–Matamoros v. INS,* 86 F.3d 158, 161 (9th Cir.1996) (court must understand how the BIA arrived at the findings underlying its decision).

Moreover, the BIA failed to consider that the *reason* for the persecution of Marcu and his mother may be an independent humanitarian ground for granting asylum. *See Oso-*

*rio,* 99 F.3d at 932 (*Chen* doctrine allows asylum for severe past persecution or other humanitarian reasons). Here, Marcu and his mother were not persecuted for political activism or political opinion; they were persecuted because Marcu's mother was American. Florence's loyalty to the United States—allowing the U.S. embassy to occupy her home and fly its flag over her roof—resulted in her home being confiscated and her torture and imprisonment. Marcu's story is replete with examples of persecution simply because of his connections with the United States. His first wife found political asylum in this country because she was allowed to visit *his* U.S. relatives. The Romanian government effectively forced Marcu to divorce her. The United States once offered Marcu the opportunity to seek asylum here but he declined out of fear for his life. It seems particularly cruel to deny him the opportunity now.

I respectfully dissent.