**Violeta CIRCU, Petitioner,**

v.

**John ASHCROFT, Attorney
General, Respondent.**

No. 02–73420.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 10, 2004.

Filed Nov. 22, 2004.

Sharon M. Dulberg and Rosy H. Cho, McVey Mullery & Dulberg, San Francisco, CA, for the petitioner.

Peter D. Keisler, Assistant United States Attorney General, Civil Division; Christopher C. Fuller, Senior Litigation Counsel; and Janice K. Redfern, Office of Immigration Litigation, United States Department of Justice, Washington, DC, for the respondent.

Before O'SCANNLAIN, SILER, JR.,* and HAWKINS, Circuit Judges.

Opinion by Judge SILER; Dissent by Judge HAWKINS.

SILER, Circuit Judge.

Violeta Circu, a native and citizen of Romania, petitions for review of the decision of the Board of Immigration Appeals ("BIA") denying her claim for asylum, but permitting her to voluntarily depart the United States. Circu argues, *inter alia*, that the Immigration Judge ("IJ") and BIA violated her right to due process by relying on the Department of State "1999 Country Reports on Human Rights Practices" in Romania ("1999 Report"), a document never introduced into evidence.

Circu entered the United States on November 2, 1994, as a nonimmigrant visitor for pleasure. She was authorized to remain in the United States until November 1, 1995. On March 27, 1996, the INS charged that Circu was subject to deportation under 8 U.S.C. § 1251(a)(1)(B) (1994)[1] for overstaying her visitor visa. She applied for asylum based on religious persecution. Romania is predominantly Romanian Orthodox; Circu and her family are Pentecostal.

Circu testified that persecution of her family dates back to when she was young. Her father was imprisoned; her family was forced to live in barracks; and her brother was taken from her family. In 1987, Circu witnessed an uprising involving several political strikes in Brasov. She was injured in the streets, and later detained and interrogated by the police for 36 hours. During her detention, she was sexually harassed and slapped. In 1990, she inadvertently became involved in a miners' strike and suffered injuries. As a result of the incident, she was once again interrogated by the police and harassed.

Circu was denied admission to public universities because her parents were not members of the Communist Party. In 1990, she was eventually able to enroll in a private university in Brasov. Circu was expelled from the university in 1994 after trying to print articles detailing atrocities committed by the Romanian government in 1987. After her expulsion, she fled to the United States. Her mother and father both have been granted asylum in the United States.

The IJ decided that although Circu had proven past persecution, she failed to demonstrate a well-founded fear of future per-

---

* The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

1. Currently 8 U.S.C. § 1227(a)(1)(B).

secution due to changed country conditions. In reaching this conclusion, the IJ relied upon the 1999 Report. As Romania was no longer a Communist regime and citizens can more freely practice minority religions, the IJ determined that the Country Reports rebutted Circu's presumption of future persecution.

■ We directly review the IJ's decision since the BIA affirmed without opinion. *See Falcon Carriche v. Ashcroft*, 350 F.3d 845, 851 (9th Cir.2003). Claims of due process violations are reviewed de novo. *Lopez–Urenda v. Ashcroft*, 345 F.3d 788, 791 (9th Cir.2003). Circu claims that the use of streamlined procedures violates her due process rights. However, these procedures do not, themselves, violate an alien's right to due process. *See* 8 C.F.R. § 3.1(a)(7) and (e)(4) (2003)[2]; *Falcon Carriche*, 350 F.3d at 848.

■ Because the IJ found that Circu suffered past persecution, she was entitled to the legal presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1); *Borja v. INS*, 175 F.3d 732, 737 (9th Cir.1999) (en banc). The INS, however, can rebut this presumption by showing by a preponderance of the evidence that the conditions in Romania "have changed to such an extent that [Circu] no longer has a well-founded fear that she would be persecuted, should she return there." *Borja*, 175 F.3d at 738.

■ The IJ determined that conditions had changed, in part, by taking judicial notice of the 1999 Report, which was published after the hearing before the IJ. We review the IJ's decision to take judicial notice for abuse of discretion. *See Geta-chew v. INS*, 25 F.3d 841, 845 (9th Cir. 1994). The IJ's reliance on the 1999 Report when considering Romania's changed country conditions did not violate Circu's due process rights. Although the IJ should have referenced the "Romania Country Report on Human Rights Practices for 1997" ("1997 Report"), which was entered into evidence, her reliance on the 1999 Report was only a harmless or nonmaterial error that did not amount to an abuse of discretion.[3] *See* 8 C.F.R. § 3.1(a)(7)(ii)(B).[4]

Upon comparing the 1999 Report with the 1997 Report, we observe no significant differences between the respective reports' language concerning religious persecution in Romania. Accordingly, the IJ did not abuse her discretion in taking administrative notice of the 1999 Report. *See Geta-chew*, 25 F.3d at 845. Moreover, Circu must have had notice that the IJ relied on the 1999 Report because she raised this issue on appeal to the BIA; therefore, she also had the opportunity to challenge the report's contents.

■ Since it was not an abuse of discretion for the IJ to consider the 1999 Report, the INS successfully rebutted Circu's presumption of future religious persecution. *See Marcu v. INS*, 147 F.3d 1078, 1081 (9th Cir.1998) (Country Reports are "the most appropriate and perhaps the best resource" for facts on foreign nations' political situations). Therefore, the IJ's determination that Romania's country conditions had so changed that Circu would not suffer future religious persecution was supported by substantial evidence. *Gui v. INS*, 280 F.3d 1217, 1229 (9th Cir.2002).

**2.** Currently 8 C.F.R. §§ 1003.1(a)(7) and (e)(4), respectively.

**3.** While the BIA's streamlined opinion does not expressly indicate that it relied upon the 1999 Report, we must presume it did. Since the BIA considered this out-of-record evidence, we may also. *See Fisher v. INS*, 79 F.3d 955, 964 (9th Cir.1996) (en banc).

**4.** Currently 8 C.F.R. § 1003.1(a)(7)(ii)(B).

By the same token, the IJ neither failed to consider Circu's evidence that country conditions had not changed, see *Larita–Martinez v. INS*, 220 F.3d 1092, 1095–96 (9th Cir.2000), nor erred in finding that Circu could relocate to another part of Romania, because the Country Reports provided evidence of Romania's improved religious climate. *See Marcu*, 147 F.3d at 1081.[5]

■ Finally, because Circu did not have a well-founded fear of future persecution were she to return to Romania, the IJ did not err in concluding that she did not qualify for asylum. As a consequence, she "necessarily failed to satisfy the more rigorous standard for withholding of deportation." *De Leon–Barrios v. INS*, 116 F.3d 391, 394 (9th Cir.1997). Therefore, the IJ did not abuse her discretion in denying Circu's application for humanitarian asylum because her past persecution was not so egregious as to qualify for such relief. *See Belayneh v. INS*, 213 F.3d 488, 491 (9th Cir.2000).

**PETITION DENIED.**

MICHAEL DALY HAWKINS, Circuit Judge, dissenting.

What happened in this case would be unimaginable in any civil or criminal court in the land. The immigration equivalent of a trial is held. The record of the proceeding is complete and the fact trier retires to consider that record and render a decision. Two years later, without warning or an opportunity to rebut its contents, the judge decides the case based on the contents of a document that did not exist at the time of the hearing. The BIA then ignores a request to remand the case to rebut the evidence. To approve this result, the majority inexplicably argues that the petitioner had an opportunity to rebut the new evidence, even though it is plain she did not, and ignores *Narayan v. Ashcroft*, 384 F.3d 1065 (9th Cir.2004), which requires that the BIA address remand motions of this type.

Violeta Circu credibly testified that she and her immediate family experienced religious persecution in Romania from the time of her birth until she departed Romania in 1994. Born into a family of devout Pentecostals, both her grandfather and father were imprisoned for their religious beliefs. Her grandfather's home was confiscated, forcing Circu's family to live in barracks in Brasov. Because she belonged to a religious minority, Circu was unable to openly attend church or secure admission to a public university, and was threatened with incarceration or physical harm if she practiced her faith. Both of her parents have been granted asylum in the United States.

The immigration judge agreed that Circu's experience qualified as past persecution on account of her religion during the Communist regime in Romania. That determination created a presumption that Circu had a well-founded fear of future persecution if returned to Romania. 8 C.F.R. § 208.13(b)(1). The judge then proceeded to conclude, based on "evidence" never admitted, that the gov-

---

5. This circuit recently held when an immigrant files both an appeal and a motion to reopen to consider newly available evidence, the BIA should independently rule on the motion to reopen. *Narayan v. Ashcroft*, 384 F.3d 1065 (9th Cir. Sept.16, 2004). Although both the appeal and the motion request remand, the motion should be treated as a substantive issue separate from the appeal, *id.* at 1068 (citing *Matter of Coelho*, 20 I & N Dec. 464, 471 (BIA 1992)), because the two procedures follow different rules. *See* 8 C.F.R. §§ 3.2, 3.8, 103.5 (2000). *Narayan* is inapplicable, however, because Circu did not file a separate motion to reopen or reconsider her case. Because Circu only filed an appeal which requested remand as a remedy, *Narayan* is not controlling.

ernment had successfully rebutted the presumption by virtue of the State Department's 1999 Country Report on Human Rights Practices ("the 1999 Report"), a report that did not exist until February 2000, nearly two years after the completion of the July 1998 hearing in this matter.

It gets worse. On appeal, Circu asked the Board of Immigration Appeals ("BIA") to remand the case to the Immigration Judge ("IJ") so that she could respond, through additional evidence, to counter this report. The BIA not only ignored this entirely proper request, it then summarily affirmed the IJ's decision to deny relief. Circu must have thought she was back in Romania, in the courts of dictator Nicholai Ceaucescu.

Curiously, the majority argues that Circu actually did have notice and an opportunity to respond—because she raised the issue on appeal to the BIA. The BIA, however, is not the proper tribunal for the introduction of evidence. *See Ordonez v. INS*, 345 F.3d 777, 787 (9th Cir.2003) ("The Board is an appellate body whose function is to review, not create, a record."). Actually, Circu did exactly what she should have done: ask the BIA to remand to the IJ to permit her to introduce new evidence to counter the 1999 report.

Moreover, a recent decision of this court suggests it was error for the BIA not to expressly rule on Circu's remand request. *See Narayan*, 384 F.3d at 1068("To guard against piecemeal appeals and to insure this court is presented with a full and complete record, the BIA must address and rule upon remand motions, giving specific, cogent reasons for a grant or denial."). I do not read *Narayan* (which, incidentally, I authored) as narrowly as the majority. Majority Op. at 941 n. 5. *Narayan* does not turn on whether the motion to remand is filed as a separate motion or as part of the appeal. Here, as in *Narayan*, "the motion to remand asked for new proceedings for the IJ to consider new evidence." *Id.* This request, which stemmed from the IJ's due process violation in relying on evidence not in the record, was a reason separate from the other contentions in Circu's appeal, which focused, among other things, on whether the IJ had failed to conduct the required individualized analysis of changed conditions and whether the IJ had improperly shifted the burden to Circu to prove a well-founded fear of future persecution. *See id.*

In any event, I do not dispute that an IJ may, in appropriate circumstances, take notice of facts, including changed country conditions. It is crystal clear in this circuit that when the BIA or IJ wishes to take administrative notice of controversial or individualized facts, such as whether a change in government has vitiated any previously well-founded fear of persecution, the agency is required to give both "notice to the applicant that administrative notice will be taken *and* an opportunity to rebut the extra-record facts or to show cause why administrative notice should not be taken of those facts." *Getachew v. Ashcroft*, 25 F.3d 841, 846 (9th Cir.1994). However, when an IJ fails to give such a warning or an opportunity to offer rebuttal, it results in the denial of a full and fair hearing, which violates due process. *See Gonzalez v. INS*, 82 F.3d 903, 912 (9th Cir.1996); *Castillo–Villagra v. INS*, 972 F.2d 1017, 1027–29 (9th Cir.1992).

The majority concludes that there was no deprivation of due process rights in this case because the *1997* Country Report was part of the record and there are "no significant differences" between the two reports. I cannot agree; moreover, the IJ's opinion clearly differentiates between the two reports and relies heavily on the 1999 report

that Circu had no opportunity to address. For example, the IJ explicitly states:

> The January 1997 Profile of Country Conditions issued by the Department of State states that Pentecostals and other unregistered sects had a difficult time in Romania. *See* Exhibit 12. However, the 1999 Report indicates that open worship is now possible and is only marred occasionally by unsanctioned harassment by local officials. *See* Romania Country Report on Human Right[s] Practices for 1999, dated February 25, 2000.

This paragraph alone precludes holding that the 1999 Report did not materially affect the IJ's decision.

The IJ also noted that (as described in the 1997 Report), in 1997, ten Baptists had been publicly beaten by a crowd led by Romanian Orthodox priests and that local police did not intervene. The IJ concluded that this violence against proselytizers was an "isolated" incident, "based on other documentation provided." It is not hard to figure out that the "other documentation" was the 1999 Report, which, of course, was never part of the record, and which focuses more on discrimination suffered by the Greek Catholic Church. Indeed, elsewhere in the opinion, after again citing the 1999 Report, the IJ recognizes that "there have been recent backlashes against non-traditional religious groups, mainly the Greek Catholic Church of the Byzantine Rite," but goes on to say "there is no indication that traditional Pentecostals are being persecuted or even discriminated against in present day Romania." This is precisely the type of information Circu could have tried to present if she had been given notice and an opportunity to respond. I would grant the petition and remand to the BIA with instructions to remand to the IJ to permit Circu to present additional evidence to counter the 1999 Report.

Moreover, even if the IJ could have considered this report, substantial evidence does not support the IJ's conclusion that the 1999 report successfully rebutted the presumption of future religious persecution. One cannot read portions of the report in isolation. Although the 1999 Report indicates (as the 1997 Report did) that the Romanian Constitution "provides for religious freedom and the Government generally does not impede the observance of religious belief," it goes on to say in that same paragraph that:

> [S]everal denominations continued to make credible allegations that low-level government officials and Romanian Orthodox clergy impeded their efforts at proselytizing. The press reported several instances when adherents of minority religions were prevented by others from practicing their faith, and local law enforcement authorities did not protect them.

This is hardly resounding proof that conditions have changed sufficiently to rebut Circu's statutory presumption of future persecution on account of her religious beliefs. *See Kataria v. INS,* 232 F.3d 1107, 1115 (9th Cir.2000).

We review the work of government agencies with an understandable degree of deference. No amount of deference, however, can excuse the deliberate, calculated and cumulative unfairness which occurred here.

I respectfully dissent.